# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

**JAGDISH C. LAUL,**
      **Plaintiff,**

**vs.**                         **No. 15 CV 749 JAP/KBM**

**LOS ALAMOS NATIONAL
LABORATORIES,**
      **Defendant.**

## MEMORANDUM OPINION AND ORDER

In DEFENDANT LOS ALAMOS NATIONAL SECURITY, LLC'S MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (Doc. No. 67) (Motion), Los Alamos National Laboratories (LANS)[1] seeks dismissal of all of Plaintiff's claims brought under the Age Discrimination in Employment Act (29 U.S.C. § 621 *et seq.*) (ADEA), Title VII (42 U.S.C. § 2000e-2(a)(1)), and the New Mexico Human Rights Act (NMSA 1978 § 28-1-1 *et seq*.) (NMHRA). Plaintiff Dr. Jagdish C. Laul (Plaintiff) opposes the Motion. *See* PLAINTIFFS [sic] RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 70) (Response). LANS filed a reply brief. *See* LOS ALAMOS NATIONAL SECURITY, LLC'S REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 73) (Reply).

---

[1] Los Alamos National Laboratories (LANL) was the named defendant in the Complaint, but in its answer (Doc. No. 5), the defendant identified itself as Los Alamos National Security, LLC (LANS) and admitted that it was Plaintiff's employer at all relevant times. While LANS has been the operator of the laboratory since 2006, the acronyms LANS and LANL are used interchangeably. In this opinion, the Court will use the acronym LANS whenever possible.

I.     STANDARD OF REVIEW

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002).

II.    BACKGROUND[2]

A.     *Work History 1999-2009*

Plaintiff was born in India. (Compl. ¶ 6.) In 1974, Plaintiff became a United States citizen. (*Id.*) In October 1999, Plaintiff began working at LANS as a Principal Safety Engineer in the Environmental, Safety & Health Division. (Mot. Undisputed Material Facts (UMF) 1; Compl. ¶ 5.) Plaintiff was 60 years old when he was hired at LANS. (UMF 1; Compl. ¶6.)

On October 8, 2002, Plaintiff's supervisor, Eric McNamara, made positive statements in Plaintiff's yearly evaluation for fiscal year 2002:

---

[2] The facts in this section are undisputed unless otherwise noted.

> J.C.[3] is a diligent worker who eagerly accepts all assignments and works hard to complete these assignments in a timely fashion. He cares about providing good support to his customers and works hard to be an effective team member.

In the same evaluation, however, Mr. McNamara reported some negative feedback about Plaintiff's work and interpersonal skills:

> [Plaintiff] had a number of mildly negative comments from customers regarding the technical safety analysis work he did and also for his interpersonal skills. The technical comments were due to his lack of judgment and understanding in performing safety analysis. The interpersonal skills comments resulted primarily from his mannerisms and insensitivity towards customers. In particular, several customers stated that he is "tenacious" to the point of distraction.

> To his credit, once notified by his management, he has actively worked on resolving his customers' concerns . . . as well as to improve his safety analysis techniques.

(Mot. Ex. A-1.)

In Plaintiff's evaluations for subsequent years, his supervisors reported concerns about Plaintiff's interpersonal relations. *See* Mot. Ex. A-2 ("personnel interactions needed some improvement and JC has been working to that end."); Mot. Ex. A-3 ("some personnel interaction issues still persist . . . I recommend that JC attend some training on interpersonal relations"); and Mot. Ex. A-4 ("there was some difficulty in his teaming and customer interaction. . . . [T]here was negative feedback . . . regarding JCs [sic] ability to successfully work with facility managers and tenants."). But, in those same years, Plaintiff received many positive comments. *See* Mot. Ex. A-2 ("JC continues to provide dedicated, timely, and effective services to varied safety basis customers."); Mot. Ex. A-3 ("JC continues to provide dedicated, timely, and effective services to varied safety basis customers. . . . JC published a paper on chemical categorization practices. He received a commendation letter from DOE  . . ."); and Mot. Ex. A-4 ("Positive feedback was received from the SB-Waste Group Leader regarding [Plaintiff's] individual performance in

---

[3] In yearly evaluations, Plaintiff is often referred to as J.C. or JC.

working on waste site and facility technical issues, and from the Engineering Manager for

MCFOD for work on BTF."). In Plaintiff's evaluation for fiscal year 2006, his supervisor, James

L. Tingey, mentioned a concern about Plaintiff's work product and that "[t]he FOD requested

minimizing JC's work effort within the Division. JC's final work products typically need

significant rework for grammar, and in some cases standard format and acceptable content." (*Id.*)

When LANS took over operation of the laboratory in 2006, LANS retained Plaintiff as a

Safety Basis Analyst-2[4] and as a Team Leader assigned to the Safety Basis Division-Tritium,

Accelerator & Non-Nuclear Group. (Mot. Ex. B Laul Depo. 36:23–37:13.) Mr. Tingey was the

Group Leader for the Safety Basis Division-Tritium Accelerator & Non-Nuclear Group.

In Plaintiff's evaluation for fiscal year 2008, Plaintiff's supervisor R. Mike Mobley

described Plaintiff's communication issues:

> The overall Performance Rating is reflective of the low scores received on
> Behavioral Competencies Communication and Personal Leadership. . . . He needs
> to improve his two-way communications skills . . . to improve his ability to
> listen[.] . . . He needs to significantly improve his writing skills to reduce rework
> on the documents he prepares. Attendance at a writing course is recommended.

(Mot. Ex. A-5.) Mr. Mobley also noted that Plaintiff "usually met minimum management

expectations for the evaluation period. He is a technically strong analyst, particularly within his

specialty." (*Id.*)

In 2008, Plaintiff was promoted to Safety Basis Analyst-3 (SA-3). (Mot. Ex. A Doak

Decl. ¶ 6.) Plaintiff's evaluation for fiscal year 2009, prepared by his manager Ron Selvage,

noted that overall, Plaintiff "Fully Meets Expectations." (Mot. Ex. A-6.) However, Mr. Selvage

noted:

---

[4] At the time, LANS had four Safety Basis Analyst levels. Safety Basis Analyst-1 was the lowest level and
Safety Basis Analyst-4 was the highest level.

> [T]here are still issues with communications between customers and team members, there is improvement over the last 6-months [sic]. . . . JC needs to focus on organizational goals and helping/respecting others . . . JC has improved his Team Work, . . . [one] incident could have been handled in a better non-confrontational manner.

(*Id.*)

Plaintiff received a 2009 Individual Distinguished Performance Award for work that produced cost savings of about $5 million per year. (Resp. Ex. E.) In the previous twelve years, no employee from the Safety Basis Division had received that award. (Resp. Ex. A; Laul Depo. 53:13–54:5.)

    B.    *2010: Promotion, Transfer, Negative Evaluation, and Disciplinary Memorandum*

In early 2010, Plaintiff was promoted to Safety Basis Analyst-4 (SA-4). (Mot. Ex. A Doak Decl. ¶ 7.) In July 2010, Plaintiff was transferred to the Safety Basis-Technical Services Group. In August 2010, Dr. Lisa Pansoy-Hjelvik was assigned as the Group Leader. (*Id.*)

On September 15 and 20, 2010, Dr. Pansoy-Hjelvik held two meetings to address Plaintiff's "work issues." (*See* Mot. Ex. C Dunn Email dated Sept. 22, 2010.) Dr. Pansoy-Hjelvik, Plaintiff, Pam Peterson, Tony Marth, Mike Mobley, and Deputy Division Leader (Safety Basis Division) Thomas D. Dunn attended the meetings. (*Id.*) On September 22, 2010, Mr. Dunn sent Plaintiff by email a Memorandum of Expectations (MOE) outlining four "expectations," discussed at the meetings addressing Plaintiff's behavior. (*Id.*) The four

expectations were entitled, (1) Chain of Command;[5] (2) Acting in a professional manner;[6] (3) Interaction with the customer;[7] and (4) Time and Effort (T & E).[8]

In Plaintiff's evaluation for fiscal year 2010, Dr. Pansoy-Hjelvik gave Plaintiff an overall performance rating of "Needs Improvement." (Mot. Ex. A-7.) Dr. Pansoy-Hjelvik recorded several areas of concern under the Behavioral Competencies section of that evaluation:

> JC needs to work on having professional and respectful verbal and e-mail communications. Since August, a new SB-TS Group Leader started enforcing a policy of having team members report time and resource loading to team leaders (which JC was not used to), JC has sent several questionable emails, exhibited an unwillingness to follow his group leader's directions, and the SB-DO Deputy Division Leader Identified 4 expectations JC was expected to meet.
> .  .  .
> Although JC is highly motivated, his goals do not always align with organizational goals. While re-analyzing a calculation, JC tried to use the same parameters he used in the previous analysis, even though he had been advised by management that they were not the correct or appropriate values.
> .  .  .
> JC needs to work on respecting chain of command and recognize that he is expected to work with his Team Leader as requested by his Group Leader. JC is expected not to undermine other SB-TS staff's qualifications/capabilities or his groups [sic] plans to produce products during interactions with customers. JC showed unwillingness to move to a new location when his team was required to move out of their existing trailers.
> .  .  .
> JC needs to increase his attention to detail outlined in the behavior competencies above. . . . JC needs to work on his skills as outlined by his Deputy Division Leader to recognize the chain of command without undermining SB-TS staff qualifications, and to follow the expectations outlined by his management. These four bullets outlined by his management directly correspond to the behavioral competencies listed above, and are the main reason for the performance levels in this evaluation.

(*Id.*)

---

[5] In this section, Plaintiff was told to report to his Team Leader, Tony Marth, for all assignments. (Mot. Ex. C.)

[6] In this section, Plaintiff was instructed that his verbal and email communications were to be professional, respectful, and "non-disruptive." (Mot. Ex. C.)

[7] In this section, Plaintiff was directed to refrain from undermining the SB-TS staff's qualifications and capabilities during interactions with customers. (Mot. Ex. C.)

[8] Plaintiff was told he was expected to meet with his Team Leader on each Monday to discuss "charge codes and priorities for the week." (Mot. Ex. C.)

C.   *Disciplinary Written Counseling; Fiscal Year 2011 Evaluation*

On March 7, 2011, R. M. Mobley, through Mr. Dunn, issued to Plaintiff a Notice of

Corrective Action – Written Counseling (Written Counseling) addressing "ongoing concerns

regarding [Plaintiff's] unprofessional and disrespectful behavior toward . . . [Dr.] Pansoy-Hjelvik

and [Plaintiff's] Team Leader, at the time, Tony Marth." (Mot. Ex. D-1) The Written Counseling

stated that after receiving the September 22, 2010 MOE, "there is a continued cycle of

appropriate behavior followed by instances of behavior counter to our September expectations."

(*Id.*) The Written Counseling mentioned a pattern of "defiant behavior" and Plaintiff's tendency

to "consistently challeng[e] both [Plaintiff's] Group Leader and [Plaintiff's] Team

Leader[.]"(*Id.*)

The Written Counseling personally addressed Plaintiff:

You met with your Technical Project Manager, Tony Marth, on February 22,
2011 and you acted in an unprofessional manner by yelling at him regarding a
technical issue on an EPIcode parameter. This technical issue was discussed with
your previous SB-TS management, and the instruction was for you to use a
specific parameter. Instead, the analysis performed was counter to this instruction
at the expense of the customer versus your pursuing the technical issue in a
professional manner with your management.
                    . . .
In January 2011, you had a conversation with your SERF customer where you
stated to the customer that your colleague's work was faulty and had to be fixed
and therefore, the customer needed to provide you with funds to correct the
calculation in the chemical analysis. SB-TS management had to apologize to the
SERF customer for your unprofessional behavior.
                    . . .
You continue to undermine your management and SB-TS, in general, by
attempting to involve yourself in work without prior authorization by your Group
Leader or your Technical Project Manager. . . . This cycle is untenable . . . Your
behavior is unprofessional, unacceptable, and will not be tolerated.

(*Id.*)

The Written Counseling outlined 12 expectations for Plaintiff's workplace conduct. (*Id.*)[9] The Written Counseling concluded that it was issued, "to inform you of the seriousness of these issues and offer assistance to you in meeting expectations. . . . Failure to consistently meet these expectations will result in additional disciplinary action." (*Id.*)

In Plaintiff's evaluation for fiscal year 2011, Dr. Pansoy-Hjelvik gave Plaintiff an overall performance rating of "Unsatisfactory," (Mot. Ex. A-8.) In the evaluation, Dr. Pansoy-Hjelvik noted:

> When JC has been given instruction on solving specific technical issues, multiple iterations . . . have had to occur, before JC will consider following the instruction. This has resulted in delays and additional cost in completing work assignments to the customer's detriment. In addition, JC has written several emails which have slandered his management and co-workers. In several instances, the TL and GL have been notified and requested by other team members and customers that JC temper his interactions. JC continually provides negative feedback on his co-workers [sic] products in order to bolster his work products. This method of communication has undermined the morale of the team and of those that JC interacts with.
> . . .
> JC's work behavior consistently impacts the ability to effectively achieve work milestones. The behavior challenges are compounded by deficiencies in JC's application of safety basis fundamentals.

(*Id.*)

> D.   *Transfer to Selvage's Group; Written Reprimand; Reassignment to USQ; and 2012 Evaluations*

In November 2011, Plaintiff was transferred from the Safety Basis-Technical Services Group to the Environmental and Waste Management Group, which was managed by Mr. Selvage. On February 21, 2012, Gilbert Torres, through Mr. Dunn issued a Notice of

---

[9] In the twelve expectations, the Written Counseling reiterated the four expectations from the MOE and added eight additional expectations requiring Plaintiff to (1) adhere to the standards of conduct; (2) demonstrate professional behavior in all interactions; (3) interact with management and co-workers in a respectful manner; (4) follow the directives of management; (5) address concerns directly with management in a professional manner; (6) display cooperative behavior; (7) work as a team player; and (8) maintain your composure in the workplace. (*Id.*)

Disciplinary Action – Written Reprimand (Written Reprimand). (Mot. Ex. D-2.) The Written

Reprimand described the following:

> Since receiving the written counseling on March 8, 2011, you have continued a pattern of unprofessional, disrespectful and disruptive behavior that violates the written counseling as well as the expectations provided to you on September 22, 2010. Specifically, you have sent several e-mail messages to your management at SB-TS where you undermine SB-TS staff's qualification [sic] and capabilities. . . . Additionally, on January 18, 2012, I was informed that you requested meetings with two managers with the intention of obtaining derogatory information regarding a co-worker. Respectively, these two managers described your behavior in those meetings as inappropriate, confrontational, and disruptive. . . . Your performance deficiencies are directly related to the inappropriate behaviors you continue to exhibit in the workplace.
> 
> . . .
> 
> I am concerned that you did not take the written counseling you received on March 8, 2011 seriously. These continued issues are unacceptable and will not be tolerated.
> 
> Due to the seriousness of the above issues, I am issuing you this written reprimand in accordance with P731. This reprimand is intended to avoid the need for further disciplinary action, but you are hereby notified that further issues with your behavior, professionalism, communication and job performance or failure to immediately and consistently meet expectations outlined in the written counseling . . . will result in more severe disciplinary action up to and including termination of your employment.

(*Id.*)

> Mr. Selvage described Plaintiff's work performance in mid-2012:
> 
> [Plaintiff's] 2012 mid-year performance appraisal, dated May 25, 2012, reflected my concerns that [Plaintiff] was taking too long to complete assigned tasks. . . . [Plaintiff] had to be repeatedly reminded to focus his responses on addressing the required action. He went through several iterations on some PFITs [Performance Improvements Tools System] issues because the required action was not always addressed. Most issues required rewrites before being able to submit them.

(Mot. Ex. E Selvage Decl. ¶ 6.) Mr. Selvage gave Plaintiff an overall rating of "Needs

Improvement." (*Id.*)

After that mid-year evaluation, Mr. Selvage assigned Plaintiff "the single task of

addressing the backlog of Unreviewed Safety Questions ('USQs')." (*Id.* ¶ 7.) Plaintiff's new

assignment as a Qualified Evaluator (QEV) involved "reviewing documents from LANL waste facilities to determine if the changes to facility, or to facility procedures, were still within the safety envelop set by the Documented Safety Analysis." (*Id.*) To perform this assignment, Plaintiff had to first analyze the particular change to determine the type of review to prepare. (*Id.*) "The three potential formats for a USQ are a categorical exclusion [CAT-X], a USQ Screen and a USQ Determination (USQD). [The USQD was] the most complex and time consuming." (*Id.*) Lance Platter, who was a LANS contractor, was Plaintiff's direct supervisor; and Mr. Selvage was the USQ Group Leader. (Resp. Ex. A Laul Depo. 50:10-11.)

After deciding which type of analysis to perform–a CAT-X, a USQ Screen, or a USQD– Plaintiff had to prepare an analysis, and submit that analysis to another QEV for review and editing. (*Id.* ¶ 8.) Next, a System Engineer (SE) reviewed and edited the QEV's analysis. (*Id.*) After review and edits, Plaintiff prepared a final version of the USQ analysis. (*Id.*) The analysis would then be given to the LANS customer. (*Id.*) A single USQ can take up to a few days to complete depending on the complexity of the issue. (Resp. Ex. F Selvage Depo. 41:25–42:2.)

Shortly after Plaintiff began the USQ work assignment, Mr. Selvage received complaints from Plaintiff's co-workers that Plaintiff "constantly would seek assistance and guidance from [Mr. Platter] and from other USQ preparers and SEs." (Mot. Ex. E Selvage Decl. ¶ 9.)[10] In Plaintiff's fiscal year 2012 evaluation, Mr. Selvage "documented significant deficiencies in [Plaintiff's] work performance." (*Id.* ¶ 11.) Mr. Selvage gave Plaintiff an overall performance rating of "Needs Improvement." (Mot. Ex. A-9; Selvage Decl. Ex. E ¶ 11.) Mr. Selvage noted,

---

[10] The court will consider Mr. Selvage's statement as non-hearsay because it is used to show that the complaints were received and not for the truth of the actual complaints. *See* Fed. R. Evid. 801(c)(2); Fed. R. Civ. P. 56 (c)(4) (requiring declarations supporting motions for summary judgment to contain facts "that would be admissible in evidence[.]").

> JC needs to improve his listening skills. Although he acknowledges what people are saying to him, his does not always translate into the appropriate actions. JC also needs some improvement in communicating with others through emails. He has been verbally counseled about sending inappropriate/demanding emails to a LANL employee.
>
> . . .
>
> While JC does stay late to complete tasks, he has a tendency to rely on others too much to help him complete his work. He repeatedly requested another QEV to tell him if the USQ Document he was writing should be a Screen or a USQD instead of determining this himself.
>
> . . .
>
> JC has not shown the amount of understanding of safety basis issues that should be expected from an Analyst 4. Tasks need to be explained several times, and most of his work products need significant revision.

(Mot. Ex. A-9.)

Plaintiff characterized the USQ process as a collaborative effort between USQ preparer and reviewers. (Resp. Ex. B Laul Aff. ¶¶ 2; 16.) Plaintiff testified that Mr. Platter required USQ documents to be written a certain way, even if Mr. Platter agreed with Plaintiff's conclusions. (*Id.* ¶ 4-5.) In his deposition, Plaintiff described the USQ process and why he believed he was discriminated against:

> I was working in a collaborative fashion. The project I was on, I was, you know, writing this report, which they call "USQ Project" I was on, and every time I will write a report it will be reviewed and signed by either Lance Platter, who was also working as a team lead. If he's not there, the other person was Lawrence Garcia. We three reported to Ron Selvage, who was the group leader, and then we have a like group we called "system engineers," and there were seven, eight of them. And these system engineers were assigned to different nuclear facilities with different functions. So after I get two signatures, then I go to them. Either I explain to them why I'm doing it, I sign off, either I see their point and I make changes. So everything, when I do, there are three signatures—mine, another team lead, Lance Platter or Lawrence Garcia, one of them, and then system engineers. Then that goes to Ron for review. And so it was a collaborative effort, and he could see it, there were three signatures. And yet, he will nit-pick only me, not the others. And those people are all younger than me. And that is age [discrimination]. That could be national race.

(Resp. Ex. A Laul Depo. 50:3-51:5.) In Plaintiff's opinion, any errors in a particular USQ document should have been attributed to the entire USQ group. (*Id.*)

F.  *Performance Action Plan; Performance Improvement Plan; and Termination of Employment*

In the fall of 2012, Mr. Selvage informed the Safety Basis Division Leader, James Miller, about Plaintiff's "ongoing performance issues." (Mot. Ex. E Selvage Decl. ¶ 12.) Mr. Selvage informed Mr. Miller that Plaintiff "was a level 4 Safety Analyst (SA-4) but was, at best, performing at an SA-1 or SA-2 level." (*Id.*) Mr. Selvage "advised Mr. Miller of the current status of Dr. Laul's performance evaluations and advised Mr. Miller that because Dr. Laul was unable to perform basic safety basis tasks, [Mr. Selvage] believed he should have been able to master as an SA-4, [Mr. Selvage] had assigned him the single task of preparing and reviewing USQ documents." (*Id.*) Mr. Selvage "believed that [Plaintiff's] performance on USQ preparation was more amenable to measurement than other tasks that he could only accomplish with a great deal of input from other employees." (*Id.*)

Mr. Miller directed Mr. Selvage to place Plaintiff on Performance Action Track (PAT) under LANS Policy P736 "so that Dr. Laul's performance could be monitored and assessed formally through a Performance Improvement Plan ("PIP") as part of the PAT." (Mot. Ex. E Selvage Decl. ¶ 19.) Under LANS' P736 Policy, an employee on a PAT must also be placed on a PIP detailing the employee's performance deficiencies and stating clearly written expectations and goals. (*Id.* ¶ 14.) In late 2012 and early 2013, Mr. Selvage and David Rudolph, the Senior Employee Relations Specialist in the LANS Human Resources Division-Employee Relations (HR-ER) drafted the PIP and other PAT documents. (*Id.* ¶ 20.)

On March 7, 2013, a written PAT was issued to Plaintiff describing Plaintiff's negative work performance dating back to the March 2011 Written Counseling and stating,

> As you know, we have been meeting with you since December 2012. The Performance Action Track will be in place for a period of six months after which you will be terminated if your performance is not deemed fully satisfactory. Termination may be considered before the expiration of the Performance Action Track period if little or no progress is being made toward meeting performance expectations.

(Mot. Ex. E-2 at 1.) The original written PIP stated that it was to last from December 1, 2012 to June 1, 2013. (*Id.* at 3.) Under the PIP, Plaintiff had to "prepare an average of 8 quality USQ documents each week in addition to reviewing the documents of other QEVs." (*Id.* at 3-4.) Plaintiff was required to meet with Mr. Selvage every two weeks so that Mr. Selvage could assess Plaintiff's performance and provide feedback. (*Id.* at 4.) Plaintiff was instructed not to solicit other employees to do his work for him. (*Id.* at 3.) The PIP also directed Plaintiff to "[c]omplete your assignments accurately . . . [m]aintain and develop effective work relationships . . . [i]nteract with your co-workers, management, and customers in a professional and respectful manner . . . [a]ccept direction from management without continually resisting guidance and direction . . . [and] [a]dhere to all of the expectations outlined in the March 8, 2011 Written Counseling." (*Id.*) Plaintiff was told that at the end of the PAT period, Mr. Selvage would give the SB Division Leader "a written assessment of your performance. . . . In the event it is determined that your performance has not been fully satisfactory during the course of the [PAT], you will be provided a Notice of Intent to Terminate." (*Id.* at 4.)

Under LANS Policy P736, a PAT period can last from "two to six months and ends either in fully satisfactory performance, reassignment, or termination." (Mot. Ex. E-1.) Although a termination of employment cannot be grieved, an employee may appeal a termination decision within five working days. (*Id.*)

Mr. Selvage began to review Plaintiff's work in December 2012, and in early 2013, Mr. Selvage, Ms. Barbara Pacheco, a Human Resources employee, and Plaintiff met periodically to

discuss Plaintiff's performance under the PAT. (Mot. Ex. H, Selvage Depo. 25:5-13; Ex. E-4.)

For example, Mr. Selvage sent an email to Plaintiff dated January 17, 2013 and  recounted what

was said at a meeting with Plaintiff on January 16, 2013:

> while I did acknowledge improvement in performing USQDs, I also noted that
> Lance [Platter] stated you still had some trouble with the more complicated USQ
> Documents. I also stated that I would like you to work in your understanding of
> the problems you are solving and make sure you address the questions that need
> to be answered. Overall your performance on USQDs has improved.

(Mot. Ex. E-4 at 3.)

Even though the PAT began in December 2012, the written PAT, including the written

PIP, was not issued to Plaintiff until March 7, 2013. (Mot. Ex. E-2; Resp. Ex. A Laul Depo.

143:23-144:1.) The record shows that Plaintiff, Mr. Selvage, and Ms. Pacheco held meetings

from December 2012 to May 2013, but no written assessments of Plaintiff's progress under the

PAT were issued during that time. The record contains written PAT Assessments beginning on

May 2, 2013 through October 7, 2013. (Mot. Ex. E-3.) In the first six written PAT Assessments

dated May 2, 2013, May 14, 2013, May 28, 2013, June 12, 2013, June 25, 2013, and July 23,

2013, Mr. Selvage rated Plaintiff's performance as "Satisfactory." (Mot. Ex. E-3.)

In the August 6, 2013 PAT Assessment, however, Mr. Selvage stated that he had just

learned that for the preceding five months, Mr. Platter had been assigning Plaintiff easier USQ

work involving CAT-Xs or Screens "at the level of a Safety Basis Analyst 2 and not at the level

of a Safety Basis Analyst 4." (Mot. Ex. E Selvage Decl. ¶ 18.) Mr. Selvage stated,

> Essentially, Mr. Platter advised me that it was easier for Platter to do the USQDs
> himself or to assign them to Lawrence Garcia, a SA-2 than to deal with the
> constant questioning from Dr. Laul and to have to rewrite the documents Laul was
> to prepare. . . .

> Once I learned that [Plaintiff] was not preparing the more difficult USQ
> documents, and that, in effect, I had been evaluating him essentially at an SA-2
> level not at a SA-4 level, I also realized that I was largely seeing . . . USQ
> documents *after* the QEV and the SEs had made edits and revisions to bring the
> USQ documents up to standard, I spoke with David Rudolph, Senior Employee
> Relations Specialist . . . about how I could obtain a more accurate reading of
> [Plaintiff's] performance.

(*Id.* ¶ 20.) Lawrence Garcia, a level SA-2 QEV who was assigned to the USQ project, testified

that Plaintiff continuously sought help from Mr. Platter:

> A. [Plaintiff] would continuously come into [Mr. Platter's] office. Sometimes it
> was pretty excessive, 10 to 20 times a day, asking Lance for help on a USQ or
> assistance on how to—how he should do this, or whether or not the USQ, you
> know—if this would be okay to screen or CatEx or do a determination, which are
> fundamental questions in the USQ process.
> Q. When you say they are fundamental questions, what do you mean?
> A. So, there are some things during the USQ process that, when you get a work
> order or a procedure, you should be able to read the description of change and
> know exactly whether or not it should be screened, CatExed, or go through a
> determination.
>                                     . . .
> Q. Now, did you yourself, as an SB2 at the time, have to or need to seek out Mr.
> Platter's advice on what category a USQ should be, or all these other questions
> that Dr. Laul was presenting, did you have to do that?
> A. No. I didn't have to go. And at that time, I would just look at it and I knew
> what I needed to do with it, so I would just run with it.

(Mot. Ex. I Garcia Depo. 46:25-47:23.)

After recognizing that from December 2012 to July 23, 2013, Mr. Platter had been

assigning easier USQ projects to Plaintiff, the supervisors of Plaintiff's PAT, Mr. Selvage, Mr.

Rudolph, and Division Director Miller, decided to extend Plaintiff's PAT "so that a true picture

of his ability to improve in the areas set out in the PAT as well as his ability to perform at the

level of Safety Basis Analyst 4 could be obtained." (Mot. Ex. E Selvage Decl. ¶ 20.) Plaintiff's

PAT was extended from August 2013 to October 2013. (*Id.* ¶ 21.) At that time, Mr. Selvage also

instructed Mr. Platter to submit unedited versions of Plaintiff's USQ work product for Mr.

Selvage to review. (*Id.*)

Plaintiff maintains that Mr. Selvage did not follow LANS Policy for extending the PAT because Mr. Selvage did not have the extension approved in writing by "upper management." (Resp. Ex. B; Laul Aff. ¶ 10.) Under LANS Policy P736, a PAT time frame "can be extended with approval from the division- or higher-level manager." (Mot. Ex. E-1 § 3.2.) However, written approval was not required, and Division Director Miller approved the extension. (Selvage Decl. ¶ 20.)

Plaintiff contends that he was placed on the PAT to get rid of him for discriminatory reasons and because he complained to HR about discrimination. Plaintiff disputes the evidence that he only did easy USQs during the time period from May to July 2013. Plaintiff testified that he was always given USQs that had "varying degrees of difficulty." (Resp. Ex. A Laul Depo. 121:17-122:17; 202:17-21.)[11]

---

[11] Plaintiff testified that Mr. Platter sometimes assigned USQs based on an employee's area of expertise:

A. The way the process works, . . . Lawrence [Platter] is kind of a point of contact receiving requests from customers, so he then assigns who he gives it to.
Q. I want to be sure we're talking about during the PAT.
A. Yes. This is during the PAT process.
Q. Okay.
A. So he will say, "JC, why don't you handle that." He assigns me. And in terms of efficiency, he knows one of the things I'm good at and one of the things he's good at and one of the things Garcia is good at. Let's say if they are particularly—certainly SSR is very good for him. He has done many of them. He would take them.
I am very good in procedure, environmental, and some other thing, I forget now. He would say, "Oh, this goes to JC, and whatever is for Lawrence goes to them."
So when he gives it to me, I write the ESQ [sic] procedure. After I'm done, satisfied, I think it's a product ready to be reviewed, I give it to—if Lance is available, I give it to him. Sometimes he's gone. He leaves on Thursday or Friday and comes back the following Monday.
So over the weekend, I handle all those projects at USQ, whether they are easy or tough, according to them. So when he comes back, I show him that. He reviews it—

(Resp. Ex. A; Laul Depo. 121:14-122:17.) This testimony is insufficient to create a fact issue on whether Plaintiff was receiving easy USQ projects.

Plaintiff further testified:

Q. So we do know that Lance Platter told Ron [Selvage] he was only giving you the easy USQs and, therefore, that's why he extended [the PAT]. That's what he said right?
A. Yeah. But that does not mean that I was not doing tough ones, either.

In contrast to the May-July 2013 PAT Assessments, Mr. Selvage evaluated Plaintiff's work performance from August 2013 through October 2013 as "generally unsatisfactory." (*Id.*) In four out of six of those PAT Assessments, Mr. Selvage rated Plaintiff's performance as "Unsatisfactory." (Mot. Ex. E-3.) In one of those PAT Assessments, Mr. Selvage rated Plaintiff's performance as "Needs Improvement." In the September 3, 2013 PAT Assessment, Mr. Selvage rated Plaintiff's work as "Satisfactory" noting that Plaintiff had prepared the minimum number of USQ's for the two-week period. (*Id.*) However, Mr. Selvage noted, "[Plaintiff] told me that he worked 3 days over the weekend to complete the documents. The 2 week period for this evaluation did include one holiday, but JC is taking 12 to 13 days of work days to complete what should be done 9 days. . . . I would expect that more than the minimum number of documents would have been prepared by working an extra 3 days." (*Id.*) Mr. Selvage concluded, "[b]ased on this assessment, [Plaintiff's] rating is marginally satisfactory. If the quality does not improve and stays at this level, his next rating will be Needs Improvement." (*Id.*)

In the October 1, 2013 PAT Assessment, Mr. Selvage gave Plaintiff an overall rating of "Unsatisfactory." (Mot. Ex. E-3.) Mr. Selvage noted that Plaintiff reported preparing 16 USQ reports over the two week period, but Mr. Selvage had actually received only 14 reports. (*Id.*) Mr. Selvage determined that two of the sixteen reports had been prepared for the previous reporting period. (*Id.*) Mr. Selvage determined that the quality of Plaintiff's reports had "regressed," and contained information that did not "relate to the discussed change." (*Id.*)

In the October 7, 2013 PAT Assessment, Mr. Selvage gave Plaintiff an overall rating of "Unsatisfactory." (Mot. Ex. E-3.) Mr. Selvage commented that one of Plaintiff's reports concerned "mopping the floor." (*Id.*) For the "mopping the floor" analysis, Plaintiff had done a

---

(Resp. Ex. A; Laul Depo. 202:17-21.) Again, Plaintiff's testimony that he was doing "tough" USQ projects is insufficient to create a fact issue on Mr. Selvage's motive for extending the PAT.

USQ Screen but in Mr. Selvage's opinion, Plaintiff should have done a basic CAT-X. (*Id.*)

Another of Plaintiff's screens was for "stack sampling," which Plaintiff labeled as

"maintenance." Mr. Selvage stated that "[s]tack sampling is not maintenance." (*Id.*)

 Mr. Selvage testified, "[o]nce I began reviewing [Plaintiff's] unedited/reviewed/revised

work product, particularly on the more complex USQDs, I could see multiple deficiencies which

were documented in the PAT Assessments." (Mot. Ex. E ¶ 21.)

 Mr. Selvage admitted that although he supervised the employees in the USQ department,

he was not technically a qualified evaluator of USQ documents:

> Q. So, during the 2008 to 2015 time frame, were you considered a—what they
> call a QEV or qualified evaluator of USQs?
> A. I was not.

(Resp. Ex. F; Selvage Depo. 9:8-11.) However, Mr. Selvage often sought out a more informed

second opinion on some of Plaintiff's work product:

> Q. . . . [D]id you ever have anyone else review the USQs besides yourself?
> A. Yes, I did.
> Q. Who did you have reviewing?
> A. Whenever I reviewed, if I came up with something I thought [Plaintiff] was
> wrong on or it wasn't, things that I was going to tell him he was doing wrong in a
> meeting, I would always go for a second opinion, either Sharon Walker or Mark
> Kobi, those are the two I specifically remember. . . .
> Q. And why did you go to those two?
> A. Because they were senior level analysts. I respected their opinion. Mark Kobi
> has written probably thousands of USQDs here and at other sites.

(Resp. Ex. F Selvage Depo. 35:6-20.)

 In mid-October 2013, Mr. Selvage recommended to the Safety Basis Division Leader Mr.

Tingey, that LANS terminate Plaintiff's employment. (*Id.* ¶ 22.) Mr. Selvage provided the

written PAT Assessments and Plaintiff's work product to Mr. Tingey for his review. (*Id.* ¶ 23.)[12]

---

[12] In 2013, Mr. Tingey was the "subject matter expert on the preparation and review of [USQ] documents." (Mot. Ex. J Decl. James L. Tingey ¶ 3.) In 2006-07, Mr. Tingey had supervised and evaluated Plaintiff in the Safety Basis Division. (*Id.* ¶ 4.) In October 2013, Mr. Tingey was the Safety Basis Deputy Division Leader. (*Id.* ¶ 6.)

Under LANS Policy P736 § 4.1, Mr. Tingey was responsible for the review of the PAT process and for the review of Mr. Selvage's recommendation to terminate Plaintiff's employment. (Mot. Ex. J ¶ 8.) After a review of the materials provided by Mr. Selvage, Mr. Tingey concurred with the decision to terminate Plaintiff's employment. (*Id.* ¶ 9.) On November 26, 2013, Mr. Tingey issued a Performance Action Track-Notice of Intent to Terminate. (*Id.* ¶ 10; Mot. Ex. J-1.) Plaintiff appealed the decision to the Acting Associate Director for Business Services at LANS, William Bivens, who upheld the decision. Plaintiff's employment was terminated on December 6, 2013. (Mot. Ex. J ¶ 11; Mor. Ex. J-1.) The Safety Analyst-4 position (USQ preparer/reviewer for EWM Group) was not filled after the termination of Plaintiff's employment. (Mot. Ex. H; Ex. I.)

> ### F.   *Plaintiff's Grievances; LANS Investigation*

Under LANS Policy P791, an employee may file a grievance about yearly performance evaluations, disciplinary actions, and other personnel matters. (Mot. Ex. A Doak Decl. ¶ 10.) On April 4, 2011, Plaintiff filed a grievance on LANS Form P791 complaining about the March 2011 MOE. (Mot. Ex. A-10.) In an 11-page brief with a 34-page attachment, Plaintiff responded in detail to negative evaluations of his behavior and work product. Plaintiff also gave his opinion that his own behavior was not offensive, he criticized Dr. Dr. Pansoy-Hjelvik's behavior and management style, and he outlined instances of other employees' incompetence and unfair treatment of him. (*Id.*) Plaintiff complained, "[i]n February 2011, [Dr. Pansoy-Hjelvik] . . . assigned me a Low Contribution Rating (TCR) of 2.4 (below average), lowest score in my 11 yrs at LANL. [Dr. Pansoy-Hjelvik's] actions reflect her <u>animosity, harassment, retaliation, and discrimination against me</u>." (*Id.*) (emphasis in original).

19

On January 3, 2012, Plaintiff filed another grievance complaining about his "FY [fiscal year] 2011 'Performance Appraisal'" in which Dr. Pansoy-Hjelvik rated his overall performance as "Unsatisfactory." (Mot. Ex. A-11.) Plaintiff complained that

> Since [Dr. Pansoy-Hjelvik] has assigned "Below Expectations" in all key areas, thus the summary rating should not be rated lower than 'Below Expectations' (Needs Improvement). Since our interaction and communication problem deteriorated in the last three months, and she is short tempered and has intrinsic bias and behavior problem with me, and she needs to recognize her fault and take ownership in fixing it herself rather than blaming me for it. [Dr. Pansoy-Hjelvik] has been harassing and discriminating against me since I have been in her group since August 2010. Based on the facts stated above, I believe [Dr. Pansoy-Hjelvik's] actions against me are not only in violation of LANL policies but also retaliatory and discriminatory. Especially, in light of the facts that I earned a performance rating of 4.0 (high score) in 2008-09 PA and was promoted to SBA-4 in 2009 by the SB Review Board, and received a LANL Individual Distinguished Performance Award in 2010. [Dr. Pansoy-Hjelvik's] actions of ranking my performance as "Needs Improvement" in FY 2010 and "Unsatisfactory" in FY 2011 simply do not make any sense and clearly are retaliatory and discriminatory against me.

(*Id.*)

Plaintiff further complained that during fiscal year 2011, Dr. Pansoy-Hjelvik gave him a mid-year review that was positive, but she did not put that evaluation in writing. "I believe that [Pansoy-Hjelvik] had ill intention of not putting statements in writing, what she told me verbally on 4/19/11." (*Id.*) (emphasis in original). Plaintiff claimed that "[Dr. Pansoy-Hjelvik's] actions of ranking my performance as "Needs Improvement" in FY 2010 and "Unsatisfactory" in FY 2011 simply do not make sense and clearly are strong indication of intrinsic bias, harassment, retaliation and discrimination against me." (*Id.*) (emphasis in original).

On March 12, 2012, Plaintiff grieved the Total Contribution Rating given to him in his FY 2011 evaluation, which Plaintiff claimed constituted "harassment, retaliation, and discrimination." (Mot. Ex. A-12.)

On March 20, 2012, Plaintiff filed a grievance complaining about the March 2011 MOE and about the February 2012 Written Reprimand. (Mot. Ex. A-13.) Plaintiff indicated that these actions were discriminatory, and harassing due to age, race, and nationality. (*Id.*)

Ms. Doak, an employee in LANS' HR department, testified that the LANS Employer Relations Division investigated each of Plaintiff's P791 grievances, and found Plaintiff "had never been subjected to discrimination or retaliation on the basis of his age, race, or national origin." (Mot. Ex. A Doak Decl. ¶ 16.)

On September 14, 2013, Plaintiff wrote a "Response to [Ron Selvage's][13] Status Report of 9/3/13: Provided to J.C. Laul on 9/6/13." (Mot. Ex. N.) In the lengthy memorandum, Plaintiff complained that Mr. Platter was giving Plaintiff the "tough" USQ projects and that "[t]his is a <u>violation</u> of our agreement." (*Id.*) (emphasis in original). Plaintiff further complained that Mr. Selvage was reviewing "draft" copies of Plaintiff's reports before they were "finalized for signatures." (*Id.*) In Plaintiff's opinion, Mr. Selvage's review of Plaintiff's unedited reports was "<u>highly unfair</u>." (*Id.*) (emphasis in original).

On November 13, 2013, Plaintiff sent an email to both Mr. Selvage and Ms. Pacheco describing a meeting with Mr. Selvage to go over the "10/7/13 package." (Mot. Ex. N.) "[Mr. Selvage] explained the reasons of his negative comments on 3 USQs out of 17. Then I asked if I can make copies of these 3 USQs, Ron [Selvage] refused, which utterly surprised me[.]" Plaintiff mentioned that he had only five days to appeal under the PAT process and he needed copies of his USQs for his appeal. (*Id.*)[14] Plaintiff then asked Mr. Selvage to hold a meeting about Plaintiff's USQ reports that included the other USQ preparers "to go over the negative comments of 10/1/13 and 10/7/13, so that they could collectively benefit from [Mr. Selvage's] input." (*Id.*)

---

[13] Plaintiff was referring to one of Mr. Selvage's PAT Assessments.

[14] Although LANS' PAT Policy P736 requires the reviewer to give the employee copies of each PAT Assessment, no evidence of record shows that Mr. Selvage was required to give Plaintiff copies of Plaintiff's USQs.

Mr. Selvage refused to hold that meeting, which Plaintiff attributed to discrimination. (*Id.*) In sum, Plaintiff's email contained a lengthy and detailed explanation refuting each minute detail of Mr. Selvage's October 1, 2013 Assessment. (*Id.*) Plaintiff also noted that Mr. Selvage's "negative comments" were "<u>highly unfair and discriminatory</u> because others make the same mistakes as I do." (*Id.*) (emphasis in original).

After his employment was terminated and his appeal was denied, Plaintiff submitted a memorandum dated January 5, 2014 to Mr. Richard A. Marquez, LANS Executive Director, asking Mr. Marquez to reconsider the decision to terminate his employment. (Mot. Ex. P) (Marquez memorandum). In the Marquez memorandum, Plaintiff described his belief that Mr. William Bivens did not review Plaintiff's "appeal package of 186 pages that included 5 Appendices (A to E)." (*Id.*) In particular, Plaintiff noted that his Appendix C with 133 pages "contained my technical responses to show convincingly that Need Improvement [sic] and Unsatisfactory status reports by Ron Selvage should have been assigned 'Satisfactory.'" (*Id.*) Plaintiff stated, "I gave my appeal package to Bivens on 12/5/13 evening and he sent me termination letter the next day (12/6/13), which tells me that this was his preplanned decision, although Section 3.6.1 of PAT allows 5 workdays to make the decision." (*Id.*) Plaintiff continued with a detailed explanation of how he thought the PAT process was violated in his case. (*Id.*) Plaintiff again complained that Mr. Selvage did not share his criticisms of Plaintiff's USQ reports with Plaintiff's co-workers who would have been signatories on all final USQ reports submitted by Plaintiff. (*Id.*) Plaintiff characterized Mr. Selvage's refusal as "harassment and discriminatory." (*Id.*) Plaintiff mentioned that the "2013 Performance Guide shows that each organization needs to reduce the staff by 10% by assigning Need Improvement [sic] or

Unsatisfactory." (*Id.*) Plaintiff opined that Mr. Selvage extended Plaintiff's PAT and negatively

evaluated Plaintiff's USQ reports for the purpose of meeting this staff reduction goal. (*Id.*)

G.     *Plaintiff's Charges of Discrimination and Retaliation*

On September 11, 2014, Plaintiff filed a Charge of Discrimination (Charge) with the New

Mexico Department of Labor, Human Rights Division. (Mot. Ex. L.) On the Charge form,

Plaintiff checked the boxes labeled race, national origin, age, retaliation, and a box labeled

"other." Beside the box labeled "other" Plaintiff wrote "harassment and wrongful termination."

In a box labeled "date(s) discrimination took place" Plaintiff wrote March 2013 as the earliest

date of discrimination and December 6, 2013 as the latest date of discrimination. (*Id.*) In the

narrative section of the Charge, Plaintiff stated

> In March of 2013, I was placed on a performance action track (PAT) from
> December 1, 2012 to June 1, 2013. On June 1, 2013, I successfully completed
> PAT. My mid-year PA FY-13 was also satisfactory. Per PAT P736 3.2, the PAT
> maximum duration is six months . . . my supervisor extended the PAT process
> without justification, reason, and without my approval or approval of upper
> management[,] which is required per 3.2. In October of 2013, I was told that my
> performance was unsatisfactory based on a limited number of status reports which
> I strongly disagreed with. His many negative comments were not justified to
> which I responded. . . . I was the only one written up for unsatisfactory
> performance even though others (Team Leader and System Engineers) had signed
> off on the work I performed was [sic] part of the collaborative effort and shared
> responsibility. This is clearly a case of harassment, retaliation, and discrimination
> of age, race, and origin[.]

(*Id.*) Plaintiff further complained about perceived violations of the PAT process including his

inability to file a grievance regarding his termination of employment. (*Id.*) Plaintiff stated that he

"filed several grievances and complaints of discrimination, however, all of my grievances and

complaints have been ignored or denied." (*Id.*) Finally, Plaintiff indicated that he believed he had

been "harassed, retaliated [sic] and wrongful termination [sic], discriminated against because of

my race, age and National Origin in violation of the New Mexico Human Rights Act and Title

VII." (*Id.*)

On October 30, 2014, Plaintiff filed another Charge of Discrimination (Amended Charge)

with the Human Rights Division. (Mot. Ex. L.) Again, Plaintiff checked the boxes indicating that

he was discriminated against based on race, national origin, age, and "retaliation." (*Id.*) In a box

labeled "date(s) discrimination took place" Plaintiff wrote Feb 2014 as the earliest date of

discrimination and September 2014 as the latest date of discrimination. (*Id.*) Plaintiff described

the basis for the Amended Charge:

> The Lab Director Charlie McMillan sent out an e-mail of 1/13/14 to the LANL
> staff on "Annual EEO, AA and Diversity Statement["] and stressed that any
> violation can result in serious consequence[s]. I explained my situation in 1/14/14
> letter to Charlie McMillan on the abuse of P736 due to harassment, retaliation,
> and discrimination of age, race and origin, on the USQ project by Ron Selvage
> (Supervisor). I was hoping that Charlie will reinstate me and take serious action
> against Ron (termination), but he did not which surprised me. Perception is that
> senior management supports lower management actions even when they are at
> fault. . . . Rich Marcus in his 1/2/14 e-mail stated "Of course, you are free to apply
> as an external candidate for posted jobs that you believe fit your skill set." Before
> termination, I had applied for 10 positions. After termination, I did not get even a
> single interview. . . . [W]hen someone applies as an external candidate, the HR
> checks the personal [sic] file. If the person was terminated, shown in his personal
> [sic] file, and then his chances for interview and later job offer are significantly
> diminished to zero. This practice is an ethical violation, and wrong. If senior
> management wants someone to get a fair chance for another job, termination must
> not be listed in his/her file. I have applied for few jobs this year, but knowing that
> my file has a record of termination, I will have no chance of getting another job at
> LANL. This is harassment, retaliation and discrimination.

(*Id.*) (emphasis in original). In the Amended Charge, Plaintiff included a chart of all LANS

positions for which he applied stating that even though he was well qualified for the positions, he

"did not even get one interview." (*Id.*) Twelve positions are listed, and all but two of the

positions were filled. Plaintiff claimed that this hiring process violated the New Mexico Human

Rights Act and Title VII. (*Id.*)

H.   *Plaintiff's Applications for Positions at LANS Before and After Termination of Employment*

1.   Applications before discharge

On August 28, 2013, Plaintiff applied for a position as Group Leader for SB-TA (SBA-4), which was identified as IRC 25112. The hiring manager for IRC 25112 was Bradley Embrey, who was the Deputy Division Leader in the Safety Basis Division at LANS. (Mot. Ex. M-4 Embrey Decl. ¶ 1.) This was an external job posting that was open to internal (LANS employees) and external applicants (non-LANS employees). (*Id.* ¶ 3.) Mr. Embrey determined that Plaintiff "did not meet minimum qualifications for the position and therefore [Plaintiff] was not offered an interview for that position." (*Id.*) In May 2014, Mr. Embrey hired James Leslie Clark to fill that position. (*Id.*) Mr. Embrey stated that he was not aware of Plaintiff's claims of discrimination and his decision was based solely on Plaintiff's failure to meet the minimum qualifications for the position "and was not based on any consideration of [Plaintiff's] age, race or national origin." (*Id.*)

On September 2, 2013, Plaintiff applied for a Safety Basis Analyst 5 position, which was an external posting identified as IRC 21393. Mr. Tingey, who was the hiring manager for Safety Basis Analyst positions, stated that he "determined that [Plaintiff] did not meet minimum qualifications for the position and therefore [Plaintiff] was not offered an interview for the position." (Mot. Ex. M-2 Tingey Decl. ¶ 3b.) Mr. Tingey testified that he recommended to the hiring group that Plaintiff not be interviewed or hired because Plaintiff had been discharged. Mr. Tingey hired Heath Erik McLaughlin and Randy Janke Job to fill IRC 21393. (*Id.*)

On September 8, 2013, Plaintiff applied for two job postings entitled Environmental Professional 3 and identified as IRC 24093 and IRC 26032. The hiring manager for that position was Anthony Grieggs, who was an Environmental Manager 4 in the Environmental Compliance

Program at LANS. (Mot. Ex. M-5 Grieggs Decl. ¶ 3a.) Mr. Grieggs determined that Plaintiff did

not meet minimum qualifications for the position. (*Id.*) Therefore, Mr. Grieggs did not offer

Plaintiff an interview for either position. (*Id.* ¶¶ 3–4.) Mr. Grieggs hired Walter Wiley Whetham

to fill IRC 24093. (*Id.* ¶ 3a.) Mr. Grieggs hired Marjorie Bloomhardt Stockton and Brinda

Ramanathan to fill IRC 26032. (*Id.* ¶ 3b.) Mr. Grieggs stated he had no knowledge of Plaintiff's

discrimination claims or his performance issues. (*Id.* ¶ 4.)

 In September 2013, Plaintiff applied for five internally posted Engineering Manager

(EM-3) positions. The positions were posted as IRC 25293, IRC 25712, IRC 26632, IRC 26652,

and IRC 25752. Leah Sanchez, HR Manager 4 with LANS, described the process related to

Plaintiff's applications for these internal job postings. (Mot. Ex. M-6 Sanchez Decl. ¶ 3.) Ms.

Sanchez stated that although LANS received applications from Plaintiff for the positions in

September 2013, interviews for the positions did not occur until after Plaintiff's employment was

terminated. Therefore, when the interview process began, Plaintiff was no longer eligible for

these internal positions. (*Id.* ¶¶ 3a-e.) Jorge Ruiznavarro, Stacey Talachy, Daniel Pennington,

and Gerald Merkey were hired for IRC 25293. (*Id.* ¶ 3a.) David G. Rael was hired for IRC

25712. (*Id.*¶ 3b.) Stephen Andrew Ney was hired for IRC 26632. (*Id.*¶ 3c.) Joseph L. Sanchez

was hired for IRC 26652. (*Id.* ¶ 3d.) Job posting IRC 26752 was not filled. (*Id.* ¶ 3e.)

 Also in September 2013, Plaintiff applied for the position of Environmental Manager 2,

an external posting identified as IRC 27752. Kenneth A. Vigil was an HR Generalist who

supported the Regulatory Support and Performance Group. (Mot. Ex. M-1 Vigil Decl. ¶ 3.) On

September 24, 2013, Mr. Vigil received Plaintiff's application for that position. (*Id.*) Mr. Vigil

interviewed Plaintiff for the position on December 5, 2013. (*Id.*) However, job posting IRC

27752 was cancelled on March 31, 2014, and the position was not filled. (*Id.*)

26

Thus, before he was discharged, Plaintiff applied for a total of ten positions, five of which were internal postings that were not open for interviews until after Plaintiff was terminated so Plaintiff became ineligible for those positions. Two of the positions were cancelled and not filled.

2.      Applications after discharge

In May 2014, Plaintiff applied for an external position as a Safety Basis Analyst 3/4 identified as IRC 33782. (Mot. Ex. M-2 Tingey Decl. ¶ 3a.) Mr. Tingey did not offer Plaintiff an interview for the position because he determined that "[Plaintiff] was not the best qualified for the position." (*Id.*) Mr. Tingey hired Jon David Nelson and Mark John Kobi for IRC 33782. (*Id.*) Mr. Tingey stated that his decision not to offer an interview to Plaintiff for this position was not based on Plaintiff's age, race or national origin but was based on Plaintiff's recent discharge from employment at LANS. (*Id.* ¶ 4.)

On July 8, 2014, Plaintiff applied for the position of Geologist 3/4, an external posting identified as IRC 34464. On July 21, 2014, Mr. Alan MacGregor, the hiring manager, received Plaintiff's application. (Mot. Ex. M-3 MacGregor Decl. ¶ 3.) After reviewing all of the applications, Mr. MacGregor did not offer Plaintiff an interview for the position because "[Plaintiff] did not meet minimum qualifications for the position[.]" (*Id.*) Mr. MacGregor hired Stephen Spalding White for the position. (*Id.*) Mr. MacGregor stated that he knew nothing about Plaintiff's claims of discrimination or Plaintiff's performance issues. (*Id.* ¶ 4.)

Thus, after he was discharged, Plaintiff applied for two positions. With regard to all of the positions for which Plaintiff applied, Mr. Selvage, as a group leader, could review all of the candidates for open positions. (Resp. Ex. F Selvage Depo. 72:10-16.) Mr. Selvage did not recommend Plaintiff for any of the positions because Plaintiff "had just been terminated." (*Id.*)

27

I.      *Plaintiff's Complaint in this Lawsuit*

On August 25, 2015, Plaintiff filed his COMPLAINT FOR EMPLOYMENT

DISCRIMINATION AND RETALIATION (Doc. No. 1) (Complaint). In Count I of the

Complaint, Plaintiff claims he was discriminated against on the basis of his age in violation of

the NMHRA and the ADEA. (Compl. ¶¶ 25-27.) In Count II, Plaintiff claims that LANS

discriminated against him on the basis of national origin in violation of the NMHRA and Title

VII.[15] (Compl. ¶¶ 28-30.) In Count III, Plaintiff asserts a retaliation claim alleging that he

"complained about discrimination in the workplace," and as a result of his complaints, Plaintiff

was retaliated against in violation of the NMHRA and Title VII. (Compl. ¶¶ 31-34.)

III.    DISCUSSION

A.      *Exhaustion of Administrative Remedies*

1.      Age and National Origin Discrimination Claims

Under the NMHRA, Title VII, and the ADEA, a claimant must exhaust administrative

remedies before filing suit. *See Shikles v. Sprint/United Management Co.,* 426 F.3d 1304, 1317

(10th Cir. 2005) (recognizing that ADEA and Title VII require exhaustion of administrative

remedies); *Luboyeski v. Hill*, 117 N.M. 380, 872 P.2d 353, 355 (1994) ("[W]hen a defendant is

sued under the [New Mexico] Human Rights Act the plaintiff must exhaust her or his

administrative remedies before bringing an action in district court."). Requiring a claimant to

exhaust the administrative process "put[s] an employer on notice of a violation prior to the

commencement of judicial proceedings . . . [and facilitates] internal resolution of the issue rather

than promoting costly and time-consuming litigation." *Mitchell v. City and County of Denver*,

---

[15] In his Charge and Amended Charge, Plaintiff complained about racial discrimination; however, he claims
only age and national origin discrimination in his Complaint.

112 Fed. App'x 662, 666 (10th Cir. 2004) (citation omitted) (unpublished).[16] Under these statutes, a claimant must file a charge of discrimination with the appropriate state authority within 300 days of each discrete act of discrimination or retaliation. *Noland v. City of Albuquerque*, 779 F. Supp. 2d 1214, 1232 (D. N.M. 2011).

LANS argues that even though Plaintiff exhausted his discriminatory discharge claim, Plaintiff failed to timely exhaust claims based on the pre-discharge events. LANS submits that since Plaintiff filed his initial Charge on September 11, 2014, Plaintiff may base his claims of age and national origin discrimination only on events that occurred on or after November 15, 2013. In support of its argument, LANS cites *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215 (10th Cir. 2006) *abrogated in part by Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

The Tenth Circuit's opinion in *Haynes* is instructive. In *Haynes*, the plaintiff claimed that she was placed on a Performance Improvement Plan (PIP) and subsequently discharged in a reduction in force (RIF) in violation of Title VII and the ADEA. 456 F.3d at 1224. The employer argued that the plaintiff failed to timely exhaust her administrative remedies for several actions about which she complained. *Id.* The court noted, "a [Title VII] cause of action accrues 'on the date the employee is notified of an adverse employment decision by the employer.'" *Id.* (citation omitted). Consequently, the court focused on what adverse employment actions by the plaintiff's employer triggered the 300-day limitations period. *Id.* The court recognized that "[o]nly 'acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits' will rise to the level of an adverse employment action." *Id.*

---

[16] In *Gad v. Kansas State Univ.*, one panel of the Tenth Circuit Court of Appeals concluded that failure to exhaust should be treated as a condition precedent to suit and not as a jurisdictional prerequisite to suit. 787 F.3d 1032, 1039–41 (10th Cir. 2015).

(citation omitted). The court reviewed evidence of the discriminatory acts prior to the plaintiff's termination to determine whether they were "time-barred discrete adverse employment actions." *Id.* at 1223. The first discriminatory act was the plaintiff's placement on a PIP and the second act was the transfer by the plaintiff's supervisor of several of the plaintiff's sales accounts to another employee. *Id.* The court determined that the transfer of the plaintiff's accounts to another employee was an adverse employment action because the transfer negatively affected the plaintiff's income. *Id.* at 1224. However, the court concluded that the placement on the PIP was not an adverse employment action because it had no immediate effect on the plaintiff's "employment status." *Id.* at 1225. The court concluded that the plaintiff had not exhausted her claim based on the transfer of her accounts because the transfers occurred more than 300 days prior to the date she filed her charge of discrimination. Finally, the court held that plaintiff's discriminatory discharge claim was exhausted because she filed her charge within 300 days of her discharge. *Id.* at 1225.

In *Haynes*, the plaintiff alternatively argued that even if her claims could not be directly based on time-barred adverse employment actions, she could use those events "as background evidence in support of a *timely* claim." *Id.* at 1223 (emphasis in original). The court, however, did not allow the plaintiff to use the transfer of her sales accounts as evidence of discriminatory intent because those discrete adverse actions were time-barred. *Id.* at 1227. Without this crucial evidence of discriminatory intent and with evidence that the employer neutrally implemented the PIP and was unbiased in executing the RIF, the court upheld summary judgment in favor of the employer on the plaintiff's claim. *Id.*

Applying the principles outlined in *Haynes*, the Court determines that Plaintiff was required to file a Charge of Discrimination within 300 days from the date of each discriminatory

adverse employment action. In his Charge, Plaintiff alleged the following events: (1) he was placed on a PAT, (2) he was given negative PAT Assessments, (3) the PAT was extended, and (4) his employment was terminated. Although LANS concedes that Plaintiff's discriminatory discharge claim was timely, LANS maintains that Plaintiff cannot assert events that occurred between the initial notice of the PAT on March 7, 2013 and the conclusion of the PAT on October 6, 2013. LANS correctly maintains that out of the events that occurred in 2013, only the December 6, 2013 termination of Plaintiff's employment is directly actionable under Counts I and II. *See also Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 628 (10th Cir. 2012) (dismissing plaintiff's claims based on failure to promote because she did not file a charge within 300 days of receiving notice that her application for promotion expired); *Chung v. El Paso County/Colorado Springs Sch. Dist. #11*, 115 F. Supp. 2d 1242, 1257 (D. Colo. 2015) (dismissing discrimination claim based on failure to renew teaching contract because charge filed more than 300 days from the date plaintiff was notified of contract nonrenewal). However, unlike the plaintiff in *Haynes*, Plaintiff may use the events between March 2013 and October 2013 as background evidence to support his timely claim of discriminatory discharge because those events were not adverse employment actions. *See Sunderman v. Westar Energy, Inc.*, 307 Fed. App'x 224, 229 (10th Cir. 2009) (noting that the district court should have allowed the plaintiff to use time-barred events as background evidence in support of a timely claim).

2.      Exhaustion of Failure to Hire Claims

LANS contends that in his Amended Charge, Plaintiff did not exhaust his failure to hire

claims because he did not describe how the failures to hire were discriminatory based on age or

national origin. In his Amended Charge Plaintiff stated:

> Before termination, I had applied for 10 positions. After termination, I did not get
> even a single interview. I understand that when someone applies as an external
> candidate, the HR checks the personal [sic] file. If the person was terminated,
> shown in his personal [sic] file, and then his chances for interview and later job
> offer are significantly diminished or zero. . . . This is harassment, retaliation and
> discrimination. . . . Based on my educational background, professional
> certifications, and about 38 [years] experience in different areas, I am well
> qualified for these positions. . . . I was not even considered for an interview;
> which is clearly Discrimination[.]

Charges of discrimination are liberally construed; therefore, the court must inquire into

"the scope of the administrative investigation that can reasonably be expected to follow from the

discriminatory acts alleged in the administrative charge." *Martinez v. Target Corp.*, 384 Fed.

App'x 840, 845 (10th Cir. 2010) (unpublished) (quoting *Jones v. UPS, Inc.*, 502 F.3d 1176, 1186

(10th Cir. 2007)). *See also Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1196 (10th Cir. 2004)

("There is no doubt that Ruhrpumpen could discern from the charges filed that the plaintiffs were

accusing the company of age discrimination stemming from the events of January 3, 2001, . . . as

the EEOC could quite easily have discovered in the course of investigating the plaintiffs'

allegations that while not terminated on January 3, 2001, the plaintiffs were in fact not hired by

Ruhrpumpen on that same date.").

In his Amended Charge, Plaintiff described an email from Mr. Marcus stating that

Plaintiff was "free to apply as an external candidate for posted jobs that you believe fit your skill

set." Plaintiff then described the positions for which he applied and for which he claimed he was

well-qualified. Plaintiff complained that he was not interviewed for any of the positions despite

his qualifications and 38 years of experience. Finally, Plaintiff checked the boxes for age and

national origin discrimination and as reflected in the above-quoted language, Plaintiff attributed

his failure to receive an interview to discrimination. Under the case law standards, Plaintiff has

sufficiently described his claim that LANS failed to hire him for the positions because of his age

or national origin. Consequently, Plaintiff has exhausted his Count I and II claims based on

LANS' post-discharge failure to hire because those decisions not to hire were made after January

4, 2014–the 300th day prior to the date of the Amended Charge.

### 3.   Exhaustion of Retaliation Claims

LANS argues that Plaintiff failed to allege in his Amended Charge that he engaged in

protected activity, one of the elements required to support a claim of retaliation. The Court first

notes that in both his Charge and Amended Charge Plaintiff checked the box labeled

"retaliation," and Plaintiff described his grievances and complaints of discrimination.

Specifically in his Charge, Plaintiff stated, "I filed several grievances and complaints of

discrimination, however, all my grievances and complaints have been ignored or denied." (Mot.

Ex. L.) In his Amended Charge, Plaintiff describes the letter he wrote to Mr. Marquez, LANS'

Executive Director, complaining about discrimination. (*Id.*) The Court can reasonably infer that

LANS reviewed all of Plaintiff's grievances after receiving Plaintiff's Amended Charge. And,

although the wording in Plaintiff's verbose grievances is imprecise, the grievances are sufficient

to constitute protected activity under Title VII and the NMHRA. *See Eke v. CaridanBCT, Inc.*,

490 Fed. App'x 156, 161 (10th Cir. 2012) (finding that vaguely worded email from plaintiff's

attorney to management personnel stating "[t]his is to inform you that [plaintiff] has retained

[law firm] to investigate gender and age discrimination in her employment and treatment over

recent months" constituted protected opposition to discrimination sufficient to support a

retaliation claim). Construing liberally Plaintiff's Charge and Amended Charge, the Court finds

that Plaintiff has exhausted a retaliatory discharge claim and a retaliatory failure to hire claim.

      B.    *Counts I and II: Prima Facie Case of Discrimination on the Basis of Age and National Origin[17]*

    Under the ADEA,[18] it is "unlawful for an employer . . . to fail or refuse to hire or to

discharge any individual or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's age."

29 U.S.C. § 623(a). Under Title VII, It is unlawful for an employer "to fail or refuse to hire or to

discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin" 42 U.S.C. § 2000e-2(a)(1).

    For Plaintiff to survive summary judgment on his discrimination claims, he must present

either direct evidence of LANS' discriminatory intent or circumstantial evidence of intentional

discrimination. Plaintiff has not come forward with any direct evidence of LANS' discriminatory

intent; therefore, the Court will analyze all of Plaintiff's claims using the *McDonnell Douglas*

burden-shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See*

*Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1278–79 (10th Cir. 2010).

---

[17] Because Plaintiff presents the same evidence and arguments on both age and national origin discrimination, the Court will deal with both types of discrimination as they apply to each adverse employment action: the discharge of Plaintiff's employment and the failure to hire.

[18] The NMHRA is analyzed under the same prima facie and burden shifting format as the ADEA. *Clayton v. Vanguard Car Rental U.S.A., Inc.*,761 F. Supp. 2d 1210, 1249–50 (D. N.M. 2010). The NMHRA makes it an unlawful discriminatory practice for

    an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, . . . [or] national origin. . . .

NMSA 1978, § 28–1–7A. The Supreme Court of New Mexico applies the framework established in *McDonnell Douglas* "[w]hen considering a violation of the NMHRA." *Clayton*, 761 F. Supp. 2d at 1250 (quoting *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 9, 139 N.M. 12, 127 P.3d 548 (2005). Therefore, the Court's analysis of Plaintiff's claims under the federal discrimination statutes is equally applicable to Plaintiff's NMHRA claims.

Under this framework, Plaintiff must present evidence of a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If Plaintiff establishes a prima facie case, the burden shifts to LANS to articulate some legitimate, nondiscriminatory reason for its action. *Id.* at 802–03. If LANS carries that burden, Plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by LANS were not its true reasons, but were a pretext for discrimination. *Id.* at 804.

### 1.      Termination of Employment

To establish a prima facie case of discharge due to age discrimination, Plaintiff must show that: 1) he is a member of the protected class; 2) he suffered an adverse employment action; 3) he was qualified for the position at issue; and 4) the circumstances surrounding his discharge raise an inference of age discrimination. *Sorbo v. United Parcel Service*, 432 F.3d 1169, 1173 (10th Cir. 2005) (quoting *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004)). The fourth element may be satisfied by proof that the employer treated similarly situated employees more favorably. *Id.* (citations omitted). Likewise, to prove national origin discrimination related to his discharge, Plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166–67 (10th Cir. 2000) (noting that prima facie elements for age and national origin discrimination are the same).

There is no dispute that Plaintiff is a member of both protected classes; he is over 40, and he is of East Indian descent. Plaintiff also indisputably suffered an adverse employment action–termination of his employment. LANS submits that Plaintiff cannot establish the third element of the prima facie case: that he was qualified for the position. LANS further asserts that Plaintiff

has not produced admissible evidence on the fourth element: that he was discharged under circumstances giving rise to an inference of discrimination either based on age or national origin.

a.      Plaintiff was qualified for his position.

LANS contends there is un-refuted evidence showing that Plaintiff could not perform SA-4 level work. In Plaintiff's fiscal year 2010 and 2011 evaluations, Dr. Pansoy-Hjelvik gave Plaintiff performance ratings of "Needs Improvement" and "Unsatisfactory." Moreover, Plaintiff was reprimanded for acting unprofessionally as illustrated by the September 2010 meetings, and the March 2011 MOE. (Mot. Exs. A-7, A-8.) After Plaintiff was transferred to the EWM Group, Mr. Selvage gave Plaintiff an overall performance rating of "Needs Improvement." (Mot. Ex. A-9.) At the end of 2012, Mr. Selvage reassigned Plaintiff to help with the backlog of USQs, and after receiving complaints about Plaintiff's work product, Mr. Selvage, with management approval, placed Plaintiff on a PAT. After discovering in mid-2013 that Mr. Platter was assigning Plaintiff the easier USQ projects, Mr. Selvage and Division Director Miller extended Plaintiff's PAT, and Mr. Selvage began to evaluate Plaintiff's individual unedited work product. From August to October 2013, Mr. Selvage concluded that Plaintiff's work product was unsatisfactory. (Mot. Ex. E-3.) Based on this evidence, LANS argues Plaintiff has failed to show that he was qualified for the position from which he was discharged.

Plaintiff counters that he presented evidence to meet this element of the prima facie case. Plaintiff points to undisputed evidence that he had 15 years of experience in Safety Basis work and he was given positive evaluations from 2000 through 2009. However, this evidence does not prove Plaintiff was qualified as an SA-4 because Plaintiff was not promoted to SA-4 until early 2010. In his affidavit, Plaintiff testified, "I began working as a Safety Analyst-4 in 2010. As a Safety Analyst, I was required among other things to prepare and review USQ documents. I was

36

also the Authorized Derivative Classifier reviewer of USQs." (Resp. Ex. B; Laul Aff. ¶ 2.) Plaintiff also testified, "[i]n order to prepare or review USQ documents, the individual had to be a Qualified Evaluator, which required specialized classes, training every two years, take and pass [sic] the required test, and prepare [sic] the required number of USQ documents including at least one positive USQD for certain nuclear facilities." (*Id.* ¶ 3.) Certainly the promotion itself shows that in 2010 LANS considered Plaintiff qualified for SA-4, and in subsequent years, LANS never demoted Plaintiff to an SA-3 or SA-2. And Mr. Tingey testified that Plaintiff was trained as a QEV. (Mot. Ex. G Tingey Depo. 55:14-16) (recognizing that Plaintiff was continually trained as a QEV).

Plaintiff points to Mr. Selvage's May through July 2013 PAT Assessments giving Plaintiff's work a "satisfactory" rating. (Mot. Ex. E-3.) However, Mr. Selvage testified that from May to July 2013 Mr. Platter was not giving Plaintiff SA-4 level assignments and Mr. Selvage was not reviewing Plaintiff's individual work product. (Mot. Ex. E Selvage Decl. ¶ 18.) Finally, Plaintiff presents the deposition of Silverio Colalancia, who audited LANS' USQ documents during 2012 and 2013. Mr. Colalancia testified that he reviewed thousands of USQ documents some of which had Plaintiff's name on them and found them to be "high quality documents." (Resp. Ex. C Colalancia Depo. 10:4.)[19]

---

[19] LANS filed MOTION TO STRIKE EXHIBITS ATTACHED TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 76) (Motion to Strike) arguing that Mr. Colalancia's deposition testimony is irrelevant and is improper opinion testimony by a person who was not identified as an expert. At the Pretrial Conference held on September 15, 2016, Plaintiff's counsel argued that Mr. Colalancia was under contract to audit USQs at LANS during 2012 and 2013. Since Mr. Colalancia reviewed edited USQs, his opinion is of little value in determining Plaintiff's individual work performance. Mr. Selvage determined that he needed to evaluate Plaintiff's raw work product to adequately analyze Plaintiff's individual work proficiency. Hence, Mr. Colalancia's testimony that Plaintiff's USQ reports were of "high value," carries very little weight in determining whether Plaintiff was qualified. More importantly, Mr. Colalancia's testimony cannot lead the Court to deny summary judgment because it fails to raise a material fact issue that LANS' reasons for discharge were a pretext for discrimination.

LANS asserts that Plaintiff's evidence fails to show that Plaintiff was qualified for the SA-4 level position because the 2000-2009 evaluations were prior to Plaintiff's promotion to SA-4, the May-July 2013 PAT assessments were issued during the time Plaintiff was not being assigned SA-4 level work, and Mr. Colalancia's lay opinion that some of Plaintiff's unidentified USQ documents were "of high quality" is irrelevant to establish Plaintiff's qualifications as an SA-4. After viewing the evidence and drawing inferences favorable to Plaintiff, the Court finds that Plaintiff has met his burden to show that he was qualified for the SA-4 position.

<b>b.</b>     <b>Plaintiff raises no inference of discrimination.</b>

LANS maintains that Plaintiff has presented no prima facie evidence showing that the circumstances surrounding Plaintiff's discharge raise the inference of age or national origin discrimination. This element may be shown with evidence that an employee is replaced by someone outside the protected class, that preferential treatment was given to similarly situated employees outside the protected class, or that decision makers exhibited discriminatory animus through remarks or actions. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).

In *Plotke*, the court held that the plaintiff presented sufficient evidence from which an inference of gender discrimination could be drawn. The plaintiff was the only woman historian hired at Fort Leavenworth, and one of her coworkers told her that they were pressured to hire women at the facility. *Id.* at 1101. The plaintiff was assigned clerical job duties despite her doctorate educational level, and she was referred to by her first name, while other similarly situated male employees were referred to as "Doctor." *Id.* Also, the plaintiff was removed from a highly satisfying project to work on a supposedly important project that was never completed. *Id.*

In contrast, Plaintiff's evidence, even with favorable inferences, does not suffice to establish the fourth element of a prima facie case. Plaintiff testified that he was the only

individual in his group who was on a PAT and that he was the only person in his USQ group who was negatively evaluated. (Mot. Ex. B Laul Aff. ¶¶ 6-7.)[20] Plaintiff stresses the collaborative nature of the USQ process and the fact that other two USQ preparers/reviewers were not negatively evaluated. (*Id*. ¶¶ 14-15.) However, Plaintiff fails to establish that the other USQ preparer, Mr. Garcia, was similarly situated. Mr. Garcia was an SA-2 and he was not on a PAT. (Mot. Ex. I Garcia Depo. 41:10-24; 47:17.) The third member of the USQ group, Mr. Platter, was also not similarly situated to Plaintiff because he was the supervisor and as a contractor, was not a LANS employee.

More importantly, the collaborative "satisfactory" work produced by Plaintiff in May through July 2013 was eclipsed by the generally unsatisfactory unedited work product evaluated by Mr. Selvage from August through October 2013. Therefore, the Court cannot draw an inference of discrimination from Mr. Selvage's negative evaluations, from the fact that Plaintiff was the only person in his group on a PAT, or from Plaintiff's being the only person who received negative evaluations of his USQ work product.

Plaintiff contends that an inference of discrimination can be drawn from the actions of Mr. Selvage in extending the PAT beyond June 2013 and his decision to review Plaintiff's unedited work product. (Resp. Ex. F Selvage Depo. 66:3-14.) Plaintiff was the only employee doing USQs who was evaluated in this fashion. (*Id.*) However, when questioned why he did not evaluate Mr. Garcia's or other USQ workers in this way, Mr. Selvage explained that "[n]one of the other employees were on a PAT." (*Id.*)

Plaintiff asserts that his PAT should not have been extended because he had received all "satisfactory" PAT Assessments from May to July 2013. Plaintiff further argues that his PAT

---

[20] In the Motion to Strike, LANS argues that Plaintiff has no personal knowledge of this fact and therefore, this testimony should be stricken. Even though it is questionable how Plaintiff would know this fact, LANS presents no evidence as to why Plaintiff would not have this knowledge.

was extended without written approval from higher level management in violation of PAT Policy P736 § 3.2. As mentioned earlier, § 3.2 does not require written approval for a PAT extension. (Mot. Ex. E-1.) Mr. Selvage, Mr. Rudolph, the Senior Employee Relations Specialist in HR-ER, and Division Director Miller jointly approved of the extension of Plaintiff's PAT. (Mot. Ex. E; Selvage Decl. ¶ 20.) Moreover, there is no requirement in the PAT Policy that an employee receive unsatisfactory PAT Assessments before a PAT may be extended. (Mot. Ex. E-1.)

The evidence shows that Mr. Selvage followed LANS Policy P736 in extending the PAT. Mr. Selvage was also justified in asking for Plaintiff's unedited work product so he could get a clear picture of Plaintiff's individual work product. Moreover, LANS presented evidence challenging Plaintiff's view that USQ preparation required collaboration with the other USQ group members. Mr. Tingey testified:

> Q. Before sometime in this deposition you stated that, in answer to a question from Mr. Gilpin, you stated that the USQ process is a collaborative process. What did you mean by that?
> A. The qualified evaluator should collaborate with the person who is proposed, or persons who has [sic] proposed the change to fully understand that change. So that is the collaboration I'm talking about, collaborate with the engineer, the scientist, who is proposing the change to the facility, proposing a change to a procedure, or proposing a new test or experiment, so that you can fully understand that change.
> Q. Does the preparer of the USQ collaborate with the reviewer of the USQ?
> A. That is not encouraged, because the reviewer is supposed to maintain independence in reviewing it.

(Mot. Ex. G; Tingey Depo. 57:22-58:13.)

Finally, Plaintiff attempts to raise the inference of discrimination by pointing out that neither Mr. Platter nor Mr. Garcia, the only other USQ preparers, received such "strict scrutiny." However, Plaintiff fails to show that these two employees were similarly situated. The record contains no evidence of their age or national origin, and Mr. Selvage testified that Plaintiff was scrutinized because he was on a PAT.

On this record, the Court concludes that Plaintiff has failed to satisfy his burden to show that the circumstances surrounding his placement on a PAT, the extension of the PAT, and his discharge for failure to satisfy the PAT requirements can be interpreted as discriminatory on the basis of age or national origin. Even though Plaintiff perceived he was treated unfairly, this does not suffice to meet even the minimal burden to produce some evidence of discrimination in the events leading up to his discharge.

c.   Plaintiff fails to present a fact issue that LANS legitimate reason for discharge was a pretext for discrimination.

Even if Plaintiff had presented a prima facie case of discriminatory discharge, LANS has met its burden to show Plaintiff was discharged for non-discriminatory reasons. The evidence shows that Plaintiff was discharged for unsatisfactory work performance. From 2010 to 2012, Plaintiff was disciplined for unprofessional work behavior as illustrated by Dr. Pansoy-Hjelvik's negative yearly evaluations, the September 2010 meetings about Plaintiff's unprofessional behavior, the March 2011 disciplinary MOE, and the February 2012 disciplinary Written Reprimand. After the transfer to Mr. Selvage's group, Plaintiff was placed on a PAT in December 2012. LANS produced evidence that Plaintiff did not satisfactorily perform his work under the PAT, which led to Plaintiff's discharge in late 2013.

Now, it is Plaintiff's burden to come forward with evidence showing that LANS' proffered reasons for discharge were a pretext for discrimination based on Plaintiff's age or national origin. Plaintiff may prove pretext by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006).

41

Evidence of pretext may include "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating ... criteria); and the use of subjective criteria." *Merritt v. Tellabs Operations, Inc.*, 222 Fed. App'x 679, 682 (10th Cir. 2007). "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1225 (10th Cir. 2007). Importantly, the "relevant inquiry is not whether [the employer's] proffered reasons were wise, fair, or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004). In analyzing pretext evidence, courts are not to sit as "super personnel departments free to second-guess the business judgment of an employer." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Plaintiff states that the Court can infer pretext from the fact that Plaintiff was the only employee who was placed on a PAT "for issues in collaborative work." Plaintiff seems to attribute his placement on the PAT to the collaborative USQ work he began in mid-2012. However, Plaintiff was placed on the PAT after several negative evaluations, after the MOE, and the Written Reprimand.

Plaintiff points to evidence that his PAT required what he characterizes as an unreasonable number of completed USQ analyses, an average of 8 per week. Plaintiff cites Mr. Garcia's testimony that some weeks he produced only 5 USQ analyses. However, Mr. Garcia was not similarly situated to Plaintiff. Plaintiff highlights Mr. Garcia's testimony that some USQs could take longer than one day to produce. However, Mr. Garcia also testified that he averaged from 5 to 10 USQs per week. (Resp. Ex. G Garcia Depo. 45:21-25.) There is simply no

evidence that the terms of Plaintiff's PAT were unreasonable, much less a pretext to hide discrimination.

Plaintiff argues that Mr. Selvage must have used subjective criteria to evaluate his work product because Mr. Selvage was not a QEV, and therefore, was not qualified to review Plaintiff's USQ work product. However, the evidence shows otherwise. In a letter dated September 14, 2013, Plaintiff even recognizes that Mr. Selvage attended a USQ course and also "taught a few sections" of that course. (Mot. Ex. N at 2.) In his deposition, Mr. Selvage acknowledged that as a manager, he was not an active QEV, which requires the continuous production of USQs. (Resp. Ex. F Selvage Depo. 9:8-25.) But, Mr. Selvage testified that he remained a subject matter expert in the preparation and review of USQs. (Mot. Ex. E Selvage Decl. ¶ 2.) Plaintiff does not dispute the evidence that Mr. Selvage was a subject matter expert on USQs.

In addition, the Court cannot infer that Mr. Selvage inappropriately used subjective criteria to evaluate Plaintiff's USQ work product. Mr. Selvage's written PAT Assessments reveal the objective criteria used to evaluate Plaintiff's USQ work product, and the PAT Assessments also describe what improvements were necessary to get a satisfactory assessment: (1) "JC has prepared 45 USQ documents over the past 4 weeks," (2) "the USQ backlog is down," (3) [JC] … needs to stop asking for direction on which USQ document to write," (4) "[o]nly important steps should be summarized," (5) "I reiterated again that the steps of the procedure should not be copied into the USQ document," (6) "JC is reviewing a relatively small number of documents," (7) "Area G-13-563-D contained a cut and paste of the procedure steps, something JC has been told several times not to do in the USQD," (8) [o]ne of the documents submitted was a screen, but needed to be a USQD because it was performed on a procedure that is described in the Safety

Basis," (9) "I told him I thought this was a 'cut and paste' error from a previous USQD. JC

insisted it should be in the document and later sent me an email justifying this statement … the

fact that JC could not correctly explain that this was indeed an error, and kept trying to justify

why it was in the document, calls into question his understanding of the safety basis and controls

listed in the RIO and TSRs." (Mot. Ex. E-3.) In sum, Plaintiff has failed to raise a fact issue that

the criteria by which he was evaluated were so subjective that one can infer a hidden

discriminatory purpose. *See Richardson v. Gallagher*, 553 Fed. App'x 816, 824 (10th Cir. 2014)

(recognizing as objective the reviews of the employee's work product, such as the existence of

grammatical errors and failure to submit redlined versions of documents).

　　　　Next Plaintiff contends that pretext can be inferred from Mr. Selvage's extension of the

PAT in violation of the P736 Policy. As explained above, this assertion is simply incorrect.

Plaintiff further argues that an outside expert was required to evaluate USQs before Plaintiff

could be discharged for failing the PAT. However, § 3.3 of P736 does not contain that

requirement:

> The division of higher-level manager is the final authority to determine whether
> or not the employee has successfully completed the [PAT], and whether or not the
> employee's performance is fully satisfactory. If the [PAT] involves technical
> objectives, a subject matter expert from outside the employee's line management
> chain *may* review the division or higher-level manager's determination. The
> division or higher-level manager selects the subject matter expert.

(Mot. Ex. E-1) (emphasis added). Plaintiff points to Mr. Selvage's refusal of Plaintiff's request

for a meeting with Mr. Selvage, Mr. Platter, Mr. Garcia and Plaintiff to discuss the negative

comments on Plaintiff's PAT Assessments. Since Plaintiff maintained that the USQ process was

entirely collaborative, he requested this meeting to inform the others in the USQ group of

mistakes for which they were equally responsible. However, it is undisputed that Mr. Selvage's

negative PAT Assessments stemmed from his review of Plaintiff's raw unedited and un-

collaborative work product. Therefore, Plaintiff's argument that he was being blamed for collaborative errors is simply untenable.

Plaintiff complains that he was not given copies of his PAT Assessments to support an inference of pretext. However, Plaintiff admitted he received and reviewed all of Mr. Selvage's PAT Assessments, and Plaintiff submitted detailed responses to each critique of his work. (Mot. Exs. N, O.)

Next Plaintiff argues that Mr. Tingey, who reviewed Mr. Selvage's recommendation for Plaintiff's employment termination, never reviewed Plaintiff's work product or his detailed rebuttals to the PAT Assessments before Mr. Tingey approved Mr. Selvage's discharge recommendation. Mr. Tingey, who was also a subject matter expert on the preparation and review of USQs, testified that he had known Plaintiff for many years and had previously been Plaintiff's supervisor. (Mot. Ex. J Tingey Decl. ¶¶ 4-5.) Mr. Tingey declared that after reviewing Mr. Selvage's recommendation and after consulting with HR, he reviewed Plaintiff's work product prepared during the PAT and Mr. Selvage's bi-weekly PAT Assessments. (*Id.* ¶¶ 8-9.) There simply is no evidence that Mr. Selvage and Mr. Tingey deviated from the PAT process.

Finally, Plaintiff attacks the appeals process as a "rubber stamp" of the decision to fire him. However, Plaintiff's characterization of the appeals process is not supported by admissible evidence. After his Notice of Termination, Plaintiff appealed the decision, and Mr. Bivens reviewed the decision to determine if the PAT process was followed. Plaintiff presented a lengthy document to Mr. Bivens on the day before Mr. Bivens' decision was due. The evidence shows that Mr. Biven's role was only to make sure that Mr. Selvage and Mr. Tingey followed the PAT process. Mr. Bivens was not required to revisit for the third time, Plaintiff's PAT

performance, which was previously reviewed by two subject matter experts, Mr. Selvage and Mr. Tingey. The circumstances surrounding the appeal do not raise an inference of pretext.

Because Plaintiff has failed to meet his burden to produce evidence that the reason for his discharge was a pretext for discrimination, the Court will grant summary judgment on Plaintiff's claim of discriminatory discharge based on age and national origin.

2. Failure to Hire

a. No evidence that Plaintiff was qualified for the positions.

To establish a prima facie case that he was not hired due to age or national origin discrimination, Plaintiff must demonstrate that: "(1) he applied for an available position; (2) he was qualified for the position; and (3) he was rejected under circumstances which give rise to an inference of unlawful discrimination." *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1278 (10th Cir. 1999).

LANS contends that even though Plaintiff applied for a total of 12 positions before and after he was discharged, Plaintiff has not shown he was qualified for those positions. First, two of the job postings were cancelled. (Mot. Ex. M-1 Vigil Decl. ¶ 3.) Second, Plaintiff became unqualified for the four internal job postings because he was discharged and interviews for those positions began after Plaintiff was discharged. (Mot. Ex. M-6 Sanchez Decl. ¶ 3 a.– e.) As for the remaining six positions, LANS presented the declarations of each hiring manager saying that Plaintiff did not meet the minimum qualifications for the position or that Plaintiff was not the most qualified applicant for the position. Moreover, each hiring manager testified that Plaintiff was not rejected due to his age or national origin.

Plaintiff maintains that he was qualified for all of the positions for which he applied because he had 15 years of Safety Analyst experience, he was given the Distinguished

Performance Award, he had prepared numerous USQs, he and the other USQ analysts were complimented for reducing the backlog of USQs, he scored 99% on his 2013 requalification exam, and he was one of three trained USQ preparers. (Resp. Ex. A Laul Depo. 377:5-7, Resp. Ex. B Laul Aff. ¶ 3, and Mot. Ex. N.) Despite Plaintiff's opinion that he was qualified, he presents no evidence of the qualifications for each position. Therefore, the Court has no information on which to assess whether Plaintiff was qualified for any of the positions. LANS' evidence consisting of declarations of each hiring manager that Plaintiff was not qualified for each external position is entirely unchallenged. *See Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1136-37 (10th Cir. 2004) ("Plaintiff has cited to nothing in the record suggesting what the USOC's qualifications for its Senior Managing Director for Sport Resources might have been.").

Plaintiff points to Mr. Tingey's declaration that he did not recommend Plaintiff for any of the positions because Plaintiff had been recently discharged. Other than Plaintiff's argument that his discharge should not have been considered or even reported to the hiring managers, he presents no rebuttal evidence that he was qualified despite his recent discharge. Nor has Plaintiff presented the qualifications of the applicants who were hired so as to compare his own qualifications to those of the hired applicants. In sum, Plaintiff has failed to meet his burden to show he was qualified for the job positions at LANS and that precludes Plaintiff's claim of discriminatory failure to hire based on either age or national origin.

     b.  No evidence raising an inference of discrimination.

Even if Plaintiff had established a prima facie case of discriminatory failure to hire, Plaintiff has presented no evidence of the age or nationality of each person hired for the positions for which Plaintiff applied. In sum, Plaintiff has failed to bring forward evidence that LANS' failure to consider him for the positions was discriminatory.

C.      *Count III: Prima Facie Case of Retaliation*

1.      Termination of Employment.

To establish a prima facie case of retaliation, Plaintiff must show that "(1) he engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a "but for" causal connection existed between the protected activity and the materially adverse action." *Brainard v. City of Topeka*, 597 Fed. App'x 974, 981 (10th Cir. 2015) (citing *Hinds v. Sprint/United Mgmt. Co.,* 523 F.3d 1187, 1202 (10th Cir.2008)). In *Brainard*, the Tenth Circuit recognized that under *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013), the ADEA and Title VII require a plaintiff to show that he would not have been discharged "but for" his protected opposition to discrimination. 597 Fed. App'x at 981. *See also Melin v. Verizon Business, Inc.*, 595 Fed. App'x 736, 738 (10th Cir. 2014) (noting, "the district court correctly determined that Mr. Melin did not show that but-for his complaint, he would not have suffered the materially adverse employment actions."). Therefore, to establish the third element of a prima facie case of retaliation, Plaintiff must present evidence of "but for" causation. *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (citation omitted) (stating that proof of causation must be "based on more than mere speculation, conjecture, or surmise."). Causation may be shown by temporal proximity between the protected activity and the adverse employment action. *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004) (holding that temporal proximity between plaintiff's lawsuit and decision not to hire established causation sufficient for prima facie case of retaliation when lawsuit was pending during same month as decision not to hire). However, a time period of three months or more between protected activity and an adverse action is insufficient by itself to establish causation. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

If Plaintiff succeeds in making a *prima facie* showing, LANS must proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The burden then moves back to Plaintiff, who must show that the defendant's justification is a pretext for retaliation. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1229 (10th Cir. 2004).

LANS first contends that Plaintiff has not met the first element of a prima facie retaliation claim: that Plaintiff engaged in protected opposition to discrimination. As noted in the Background section, four of Plaintiff's Grievances mentioned discrimination, retaliation, or harassment– the April 4, 2011 Grievance (Mot. Ex. A-10), the January 3, 2012 Grievance (Mot. Ex. A-11), the March 12, 2012 Grievance (Mot. Ex. A-12), and the March 20, 2012 Grievance (Mot. Ex. A-13). These grievances are sufficient to constitute protected opposition to discrimination. "Protected opposition can range from filing formal charges to voicing informal complaints to superiors," *Anderson v. Wintco Inc.*, 314 Fed. App'x 135, 2009 WL 449169, * 5 (10th Cir. Feb. 24, 2009) (unpublished) (quoting *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir.2004). On September 14, 2013, Plaintiff wrote a "Response to [Ron Selvage's] Status Report of 9/3/13: Provided to J.C. Laul on 9/6/13" (Mot. Ex. N), but Plaintiff did not complain about discrimination or retaliation in that email. On November 13, 2013, Plaintiff sent an email to both Mr. Selvage and Ms. Pacheco describing a meeting with Mr. Selvage to go over the "10/7/13 package." (Mot. Ex. N.) In that email, Plaintiff complained that Mr. Selvage's refusal to hold a meeting with all USQ preparers/reviewers to go over negative comments was "highly unfair and discriminatory." (*Id.*) Although the September 2013 email is not protected activity, per se, the November 2013 email, by mentioning discrimination, suffices as protected activity for a prima facie case. *Anderson*, 2009 WL 449169, * 5. Plaintiff has met the first element of a

prima facie retaliatory discharge case. However, Plaintiff's retaliatory discharge claim fails on the causal connection element.

As mentioned, in the absence of direct evidence of retaliation, Plaintiff may establish a causal connection by proffering "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir. 1999). Plaintiff's four Grievances, submitted on April 4, 2011, January 3, 2012, March 12, 2012 and March 20, 2012 are too distant from the time that Mr. Selvage decided to discharge Plaintiff—mid-October 2013. *See Field v. Bd. of Water Comm'rs, City and Cnty of Denver*, 804 F. Supp. 2d 1160, 1171 (D. Colo. 2011) (holding that passage of more than one year between protected activity and adverse action too attenuated to establish causation.) And Plaintiff's other protected activity, the November 2013 email, does not prove retaliation because it is undisputed that Mr. Selvage made the decision to terminate Plaintiff's employment in mid-October 2013. (Mot. Ex. E, Selvage Decl. ¶¶22-23.) *See Kenfield v. Colo. Dep't of Pub. Health & Env't.*, 557 Fed. App'x 728, 733 (10th Cir. 2014) ("By its very nature, retaliatory conduct must come *after* the protected activity." (emphasis in original)) (unpublished).

### 2.     Failure to Hire

In addition to the November 2013 email, Plaintiff sent a letter dated January 5, 2014 to LANS' Executive Director, Richard Marquez, complaining that Mr. Selvage's unwillingness to share his comments about Plaintiff's USQ work product with other USQ "signatories" and the perceived violations of the PAT policy constituted "harassment and discriminatory practice." (Mot. Ex. P at 2.) These two actions are temporally proximate to the dates Plaintiff was informed

he would not be considered for the several positions for which Plaintiff applied. Therefore, Plaintiff meets the three elements necessary for a prima facie case on retaliatory failure to hire.

LANS correctly contends that it has met its burden to show that it had legitimate, non-retaliatory reasons for not hiring Plaintiff for each of the positions: Plaintiff was not qualified for those positions either because he had been discharged before the positions were scheduled for interviews (internal positions) or because Plaintiff's education and experience did not meet the qualifications for the particular position (external positions). Plaintiff presented no rebuttal to the testimony of each hiring manager that Plaintiff did not meet the minimum qualifications for a position or that Plaintiff was not the best qualified for a position.

It is Plaintiff's burden to present some evidence to raise a genuine fact issue that LANS' legitimate reasons for not hiring him were a pretext for retaliation. Although Plaintiff maintains that he was qualified for each position, Plaintiff failed to present what the qualifications were for each position; hence, the Court has no information by which to determine whether the stated reasons for not hiring Plaintiff were a pretext for retaliation. Plaintiff also points to Mr. Selvage's and Mr. Tingey's testimony that they did not consider Plaintiff for any of the open positions because he had been terminated from employment with LANS. Mr. Selvage testified:

> Q. Do you know if Dr. Laul, did he ever apply for any job vacancies in your group?
> A. Yes.
> Q. Did you ever interview him?
> A. No.
> Q. Did you ever consider him for any vacancies that he applied for in your group?
> A. So, I don't believe anyone was hired in my group. The way it works is when these positions are opened for all of the group leaders to look at, and as I looked through and look at candidates, I did see Dr. Laul's name on there, and I did not recommend him. I did not recommend him for hiring, even though I didn't hire anybody. And I did not recommend him for any positions because he had just been terminated. I didn't stop anybody from – if they had wanted to look or interview, I certainly didn't stop anyone from doing that.

(Resp. Ex. F, Selvage Depo. 72:2-19.)

      Mr. Tingey testified,

      Q. And what did you do when the applications came to you?
      A. I had my chief of staff prepare a binder that contained all the resumes for that
      particular opening. Then assembled a team and go through the resumes to
      determine which candidates should be interviewed and – to go further in the
      process.
      Q. Did you make any recommendations with regard to Dr. Laul's applications
      whether or not he would be interviewed?
      A. Yes.
      Q. What was your recommendation?
      A. My recommendation was that he would not be interviewed based on the fact
      that he was terminated because his performance in the safety basis area was not
      satisfactory.
      Q. So would it be fair to say that based on your recommendation that he not be
      interviewed, he was not given any interviews?
      . . .
      A. It was the recommendation of the hiring team that we put together.

(Resp. Ex. D, Tingey Depo. 52:4-25.) Plaintiff maintains that this evidence is sufficient to

establish a fact issue that the reasons given for LANS' failure to hire him for the external

positions were a pretext for retaliation. However, this evidence does not go as far as Plaintiff

would like. It shows no more than that LANS' officials failed to hire Plaintiff because he was

terminated from his position for poor performance. Even viewing the evidence most favorably to

Plaintiff, the Court cannot infer retaliation from the fact that these decisions were made close in

time to Plaintiff's protected activity. Hence, the Court will grant summary judgment on

Plaintiff's Count III claims of retaliation.

IT IS ORDERED that DEFENDANT LOS ALAMOS NATIONAL SECURITY, LLC'S

MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY

JUDGMENT (Doc. No. 67) is granted.

_____
SENIOR UNITED STATES DISTRICT JUDGE